## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL BRANDON KEEFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3088 |
| | ) | |
| COMMISSIONER of | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michael Brandon Keefer appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Keefer is proceeding pro se.  Keefer filed a Motion for Summary Judgment (d/e 13).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

<u>STATEMENT OF FACTS</u>

Keefer was born on January 7, 1971.  He completed high school.  He previously worked as a driver, maintenance laborer, parts specialist/trailer technician, grounds keeper, and floor finisher.  Keefer last worked in February 2011.  Keefer alleged that he became disabled on February 4, 2011.  Keefer suffers from degenerative disc disease, lipomatosis, carpal tunnel syndrome, ulnar neuropathy, chronic obstructive pulmonary disease (COPD), major depressive disorder, anxiety disorder, history of substance abuse, and obesity.  Keefer is right handed.  <u>Certified Transcript of Proceedings before the Social Security Administration (d/e 10) (R.)</u> 23, 23, 31, 62, 110, 237.

On January 3, 2011, Keefer saw his primary care physician Dr. Janet Albers, M.D., for completion of a pre-employment examination.  Dr. Albers noted that Keefer had a history of anxiety "controlled with rare intermittent Xanax."  R. 389.  Dr. Albers noted that Keefer had previously undergone left knee surgery for a torn meniscus, left shoulder surgery, and carpal tunnel release surgery.  Keefer was 71.25 inches tall, weighed 302 pounds, and had a body mass index (BMI) of 41.98.  R. 388-90.  The examination was otherwise normal.  Albers noted that Keefer was alert and cooperative,

with a normal mood and affect, good eye contact, and normal attention span and concentration.  R. 391.

On January 21, 2011, Keefer saw Linda Snyder, a Registered Nurse and Licensed Clinical Social Worker, for a pre-employment screening. Keefer reported that he had not needed to take any Xanax since November 2010.  Snyder observed that Keefer's concentration was good.  Snyder assessed Keefer with a history of anxiety, resolved, and assigned a Global Assessment of Functioning (GAF) score of 80.  R. 385.  A GAF is the measure of a clinician's judgment as to the individual's overall level of functioning or the severity of the individual's symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR), at 32-34.  A GAF score of 71 to 80 indicated either transient and expectable symptoms or no more than slight functional limitations.  Id., at 34.  The American Psychiatric Association no longer recommends the use of the GAF score.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

On February 9, 2011, Keefer saw Nurse Practitioner Airn English, FNP-BC, in Dr. Albers' office.  Keefer complained of low back pain.  Keefer described his pain as an 8 on a scale of 1-10.  Keefer said he started a job

as a truck driver on February 8, 2011. Keefer reported the combination of the big step into the truck cab and the jerking and vibration while driving the truck caused his back to start hurting. R. 381. On examination, Keefer's lumbar range of motion was limited; he had normal strength in his lower extremities; straight leg testing was negative; his reflexes were normal.[1] English prescribed an injection of Toradol for the back pain. R. 383-84.

On March 9, 2011, Keefer saw Nurse Practitioner Cynthia Ledbetter, CFNP, CDE, in Dr. Albers' office, complaining of back and right elbow pain. Keefer wanted a refill on his back pain medications. Keefer reported that he had pain in his right elbow after a martial arts move. Keefer also reported stiffness in his neck. Ledbetter found tenderness to the medial elbow. She ordered an elbow x-ray. Keefer reported no improvement in his back pain. Keefer reported that his anxiety was "not really much of a problem for him." R. 376. On examination, Keefer had decreased range of motion in his neck, radicular symptoms in his left leg, and pain and decreased range of motion in his lower back. Keefer's grip strength was normal, his gait was stable, and his reflexes were equal throughout. Ledbetter ordered an MRI and an orthopedic referral for his back and an x-ray of his elbow. Ledbetter renewed Keefer's prescriptions. R. 375-78.

---

[1] Straight Leg testing involves lying supine and raising the leg with the knee fully extended. Pain between 30 and 90 degrees of elevation indicates lumbar radiculopathy. See Dorland's Illustrated Medical Dictionary (32<sup>d</sup> ed. 2012) (Dorland's), at 1900.

On March 10, 2011, Keefer's right elbow was x-rayed.  The x-rays showed no fracture and unremarkable soft-tissue.  R. 374.

On March 23, 2011, Keefer underwent an MRI of his spine.  The MRI showed mild diffuse narrowing of the thecal sac secondary to epidural lipomatosis, and multilevel degenerative changes without degenerative canal or foraminal stenosis.  R. 370-71.

On March 28, 2011, Keefer saw Physician's Assistant Jacob Monsivais, PA, at the Southern Illinois University School of Medicine Division of Orthopedics for a pain assessment on his lower back.  Keefer rated his back pain at the time as a 7 on a scale of 1-10.  Keefer told Monsivais that he had back pain beginning in his 20's.  Keefer reported that the pain recently got worse.  He reported that he had to quit his truck-driving job because of the pain.  He said the back pain radiated down his left leg all the way to his left foot.  Keefer said he also had neck pain.  Keefer said he did not have pain in his upper extremities.  Keefer said that pain medication helped relieve the pain.  Keefer said he tried some physical therapy.  Keefer said he tried injections in the back, but they did not help.  R. 365.

On examination, Keefer had a normal gait and posture with no sign of scoliosis.  Keefer had normal muscle strength and tone.  Keefer had

discomfort with palpitation of lumbar spine and left side sciatic notch, and positive straight leg tests.  Monsivais assessed low back pain, lumbar radiculopathy, and neck pain.  Monsivais ordered six weeks of physical therapy.  R. 367-68.

On March 31, 2011, Keefer attempted to undergo an MRI of his cervical spine.  The MRI was terminated because Keefer could not tolerate being in the scanner. The radiologist did not form an impression from the terminated exam.  The radiologist suggested that Keefer reschedule the exam.  R. 363.

On June 16, 2011, Keefer saw Dr. Albers for a follow up on his back pain.  Keefer reported he had a flare up of his back pain with his job driving a truck.  He reported he was taking NSAIDs and occasional Norco for the pain.[2]  Dr. Albers noted that Keefer was scheduled to start physical therapy.  On examination, Keefer weighed 310.5 pounds and had a BMI of 43.16.  Keefer had a spasm in the paraspinal lumbar area.  Keefer's straight leg raising test was negative, his reflexes were normal, and his strength was normal.  R. 354-56.

On May 3, 2012, Keefer saw Dr. Albers for a medicine check.  On examination, Keefer weighed 288 pounds and had a BMI of 40.03.  Keefer

---

[2] Norco is a combination of hydrocodone and acetaminophen.  Dorland's, at 1290.

had slight pain in his right wrist with the Pfinkelstein's test, but negative Phalen's and Tinel's signs.[3]  Keefer had decreased grip strength in his right wrist with slight swelling.  He had normal reflexes and strength in his lower extremities.  Keefer's gait and stance were normal.  Keefer had a paraspinal spasm and tenderness in his lumbar region.  Dr. Albers referred Keefer for an EMG study of his wrists.  R. 345, 348-49.

On May 13, 2012, physiatrist Dr. Edward Trudeau, M.D., performed an EMG study on Keefer's arms.  R. 510-16.  Dr. Trudeau found moderately severe ulnar neuropathy at the right wrist "(canal of Guyon syndrome);" mild ulnar neuropathy at the right elbow "(cubital tunnel syndrome);" mild to moderate median neuropathy at the right wrist "(carpal tunnel syndrome)."  R. 515-16.

On June 1, 2012, Keefer saw Dr. Albers.  Keefer complained of pain in his right wrist.  Dr. Trudeau's EMG study showed carpal tunnel syndrome and ulnar neuropathy.  Dr. Albers referred Keefer to the surgeon.  Dr. Albers noted that Keefer had back pain and radicular symptoms.  He took Norco and NSAIDs for the pain.  Dr. Albers also noted that Keefer's anxiety

---

[3] Pfinklestein's test involves forming a fist with the thumb bent down inside the fist and bending the wrist toward the little finger.  Pain indicates inflammation of the sheath of the tendon running from the wrist to the thumb.  See Finkelstein test, available at http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/multimedia/finkelstein-test/img-20005987, viewed May 12, 2017; Dorland's, at 1882. Phalen's test involves holding the wrist fully flexed or extended for 30 to 60 seconds.  A feeling of numbness in the hand indicates carpal tunnel syndrome. See Dorland's, at 1896. Tinel's sign involved tapping the wrist.  A resulting tingling sensation indicates carpal tunnel syndrome.  See Dorland's, at 1716.

was "Stable – controlled."  Keefer was taking Alprazolam, generic for Xanax.  Albers noted that Keefer was alert and cooperative, with a normal mood and affect, good eye contact, and normal attention span and concentration R. 338-39.

On June 4, 2012, Keefer saw surgeon Nada Nikolic Berry, M.D. regarding his right wrist pain.  Dr. Berry reviewed Dr. Trudeau's report and examined Keefer.  Dr. Berry ordered an MRI before discussing surgical options with Keefer.  R. 523.

On June 7, 2012, Keefer saw pain specialist Dr. Ferdinand Salvacion, M.D., for pain in his lower back and legs.  Keefer reported that the symptoms started bothering him when he fell in 2011.  Keefer reported that he previously had carpal tunnel release surgery, left knee arthroscopy, and left shoulder surgery.  Keefer reported that the pain was worse with activities such as movement, housework, and yard work.  Ice and ibuprofen improved the pain.  On examination, Keefer's gait was stiff, his lumbar range of motion was limited, and he had a positive straight leg test.  Keefer's strength was 5/5 and his sensation was intact.  Dr. Salvacion recommended a trial lumbar epidural steroid injection.  R. 332.  On June 19, 2012, Dr. Salvacion administered a lumbar epidural steroid injection at the L4-5 level.  R. 329.

On June 22, 2012, Keefer saw Dr. Albers. Keefer complained of back and wrist pain. Dr. Albers reviewed Dr. Trudeau's EMG study and the MRI ordered by Dr. Berry. Dr. Albers said the EMG study showed ulnar neuropathy and the MRI showed extensor carpi ulnaris subluxation with associated tendonitis.[4] Dr. Albers noted that Keefer's anxiety was stable, and he took Xanax as needed. R. 335. Dr. Albers noted that Keefer's prior carpal tunnel surgery was in the 1990's. Keefer previously had a boxer's fracture and a trigger release of ulnar digits. R. 336. On examination, Keefer had normal muscle strength and reflexes. Keefer had positive Phalen's sign and Tinel's sign in his wrist. R. 337. Dr. Albers prescribed Celebrex and made an orthopedic referral. R. 338.

On July 2, 2012, Keefer saw Dr. Berry. Dr. Berry stated the MRI was negative except for a possible TFCC tear.[5] Keefer's pain had not improved with conservative treatment. Dr. Berry recommended a second carpal tunnel release surgery and a Guyon's canal release. Keefer agreed to undergo the surgery. R. 526. On July 17, 2012, Keefer's wife called

---

[4] Extensor carpi ulnaris subluxation is a dislocation of the extensor carpi ulnaris tendon in the wrist. See, Doug Campbell, Rob Campbell, Phil O'Connor, Roger Hawkes, "Sports-Related Extensor Carpi Ulnaris Pathology," British Journal of Sports Medicine, Vol. 47, Issue 17(August 26, 2013) available at http://bjsm.bmj.com/content/47/17/1105, viewed May 12, 2017.

[5] A TFCC tear is a tear in the triangular fibrocartilage complex (TFCC). The TFCC is cartilage on the little finger side of the wrist that supports carpal bones in the wrist. See Triangular Fibrocartilage Complex (TFCC) Tear, available at https://www.rushortho.com/body-part/wrist/triangular-fibrocartilage-complex-tear, viewed May 12, 2017.

Dr. Berry's office to cancel the surgery. Keefer's wife stated that he could not go through with the surgery because he was having too much stress. R. 527.

On July 25, 2012, Keefer's wife Michelle Keefer completed a Function Report—Adult—Third Party form. R. 229-36. Michelle Keefer said Keefer could no longer perform his prior work because he could not lift, bend, stoop and use tools in his right hand. R. 229. She said Keefer could not do housework, "Anything that requires long periods of standing or repetitive movement his body will not allow without much pain." R. 230. She said Keefer helped with taking care of the children, but could not bathe them or pick them up repetitively. She said Keefer fed and watered the pets. She said that he had difficulty sleeping when he was in severe pain. She said Keefer had no problem with his personal care. She said he daily made simple meals like sandwiches. He did "simple cleaning," and folded laundry. She said he could not do yard work because of his pain. R. 230-32.

Michelle Keefer said Keefer enjoyed television, sports, and activities with the children and family. He enjoyed concerts, but it was no longer feasible to go because of his condition. She said they had friends and family in their homes weekly or bi-weekly. R. 233. She opined that Keefer

could lift 25 pounds, stand for 15 minutes, sit for 30-45 minutes, and walk for 25 to 30 minutes.  She said repetitive squatting or bending caused pain.  R. 234.  She said that he followed instructions well and got along with others well.  She said that he handled stress and changes in routine well.  She said that she had not noticed Keefer engaging in any unusual behavior or having any unusual fears.  R. 235.

On the same day, July 25, 2012, Keefer completed a Function Report—Adult form.  R. 245-52.  Michelle Keefer assisted by writing the answers for Keefer.  R. 252.   Keefer said that his back pain limited him from standing for long periods; his wrist problems limited his strength, dexterity, and grip; and his anxiety increased his fear of re-injury.   Keefer said he helped with his children's meals, looked after them, and dropped them off and picked them up from school.  Keefer said his pain made it difficult to sleep.  He could see to his personal care.  Keefer said he prepared simple meals "(cereal, sandwiches)" daily.  Keefer said he was not able to stay in the kitchen long enough to prepare a full meal.  Keefer said he did fifteen to thirty minutes of housework a week.  The housework included folding laundry, dusting, sweeping, and picking up around the house.  R. 245-27.

Keefer said he occasionally watched television.  He said he spent time with his family, but his activities were limited by his condition.  He said he attended extended family dinners "every couple of weeks & holidays."  R. 249.

Keefer said he was advised not to lift more than twenty pounds or stand more than fifteen to thirty minutes.  He said he could walk for twenty minutes and sit for a half hour to an hour.  He said he was advised not to kneel.  He said he could climb one flight of stairs at the most.  R. 249-50.

Keefer said he had no problem paying attention.  He finished what he started.  He followed instructions well and he got along with authority figures well.  He said he handled stress "ok" and he handled changes in routine well.  He said he had a "Fear of losing my family and not being able to provide for them."  R. 251.

On September 14, 2012, state agency psychologist Dr. Dolores Trello, Psy.D., conducted a mental status examination of Keefer.  Keefer reported that he had anxiety:

> I have been anxious since 1996. I lost my job.  One of my cousins wrecked my car accidentally, and I had no place to live. I had a bicycle. I was going to school to get my diploma. I had to live with my uncle.  My palms sweat. I felt nervous and anxious.  I couldn't focus on simple things. My mind was racing. I felt hopeless.  I thought the only thing to do was end my life. I told my father, and he said he had the same thing.

R. 421.  Keefer reported that his anxiety was manageable until his unsuccessful MRI:

> My anxiety was manageable until recently. I had an MRI. I had a hard time swallowing, and I panicked.  I started screaming in the MRI machine. Since then, I have been consumed with anxiety. I feel nervous and scared. I can't focus on things.

R. 421.

On examination, Keefer had normal stream of conversation, memory, fund of information, abstract thinking, and judgment.  He was also able to perform simple calculations, R. 423.  Dr. Trello assessed Keefer with major depressive disorder, severe and recurrent, without psychotic features; and generalized anxiety disorder.  Dr. Trello assigned Keefer a GAF score of 50 and stated "Serious Impairment in Vocational and Interpersonal Functioning Due to his Extreme Anxiety."  R. 423-24.  A GAF score ranging from 41-50 means either serious symptoms or serious functional limitations.  DSM-IV-TR, at 34.

On September 19, 2012, state agency physician Dr. Vittal Chapa, M.D., conducted a consultative examination of Keefer.  Keefer reported that he stopped working in February 2011 because of back pain.  Keefer reported he had right carpal tunnel release surgery in the past.  Keefer reported he had pain in his right wrist and had difficulty lifting objects. Keefer reported that he had two herniated discs, pinched nerves,

degenerative disc disease, and arthritis in his back.  He reported shooting pain in his lower extremities.  He reported that he could not stand for long periods.  He reported that he had a burning feeling in his left knee. He reported his pain to be a 6 or 7 on a 1-10 scale.  Keefer reported that his pain limited his activities and mobility.

On examination, Keefer was 71 ¾ inches tall and weighed 288 pounds.  Keefer could bear weight and ambulate without assistive devices. His gait was normal. Tinel's sign was positive in both wrists.  Grip strength was 4/5 on right and 5/5 on left.  Keefer could perform fine and gross manipulations with both hands.  Keefer had weakness in his left ankle dorsiflexor muscles.  His leg strength was 4/5 on the left and 5/5 on the right.  Straight leg testing was positive on the left at 30 degrees and negative on the right.  Keefer had limited range of motion in his lumbar spine.  Keefer complained of back pain on flexing his lumbar spine. Lumbosacral spine flexion was limited to 50 degrees.  Dr. Chapa assessed lumbosacral pain syndrome and bilateral carpal tunnel syndrome.  R. 427-28.

On October 3, 2012, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Functional Capacity Assessment of Keefer. Dr. Madala opined that Keefer could lift twenty pounds frequently and ten

pounds occasionally; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop and climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, kneel, and crouch. Dr. Madala opined that Keefer should avoid concentrated exposure to temperature extremes, fumes, odors, dusts, gases, and poor ventilation. R. 94-95.

On December 11, 2012, Keefer saw Dr. Albers. Keefer saw Dr. Albers because of a painful, burning mass on his thigh. On examination, Keefer's stance and gait were normal. Keefer was anxious, but had normal thought process and content. Dr. Albers prescribed penicillin. Dr. Albers also put Keefer on a trial of Effexor for his anxiety in addition to the Xanax. Dr. Albers noted that Keefer had been on numerous antidepressants for his anxiety. Keefer was willing to try the Effexor. Dr. Albers also asked Keefer to reconsider surgery on his right arm and wrist. R. 449-51.

On January 8, 2013, Dr. Albers completed two forms entitled "Social Security Medical Assessment" and "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." R. 433-42. Dr. Albers began treating Keefer in November 2010. Dr. Albers said Keefer had pain and limitation in the right wrist; low back pain; left knee pain; anxiety; and left plantar fasciitis. Dr. Albers said Keefer's diagnoses were

confirmed by the lumbar MRI that showed multilevel degenerative changes; an EMG study that showed recurrent median nerve compression at the carpal tunnel and Guyon's canal; the arm MRI that showed a TFCC tear and subluxation of the extensors carpi ulnaris  with associated tendonitis in the right elbow; and clinical findings of severe anxiety.  Dr. Albers opined that theses impairments frequently interfered with Keefer's ability to concentrate and pay attention.  Dr. Albers further opined that his symptoms would interfere with his ability to maintain persistence or pace.  R. 433-35.

Dr. Albers opined that Keefer was incapable of handling even low stress situations.  Dr. Albers said Keefer could ambulate without assistance, but his ambulation was with severe pain and limited by anxiety. R. 434.

Dr. Albers opined that Keefer was markedly limited in his ability to perform activities of daily living.  Dr. Albers said Keefer would need to lie down throughout the day to relieve his symptoms.  Dr. Albers said Keefer would miss work four or more times a month due to his symptoms.  Dr. Albers said Keefer would need a ten-minute break every hour of an eight-hour workday.  R. 435-36.

She opined that Keefer could lift a maximum of ten pounds, could not sit or stand for prolonged periods, and could not bend, stretch, or squat.

She opined that Keefer could carry less than ten pounds occasionally, but never carry ten pounds or more.  She opined that he could walk less than a block, sit for one hour, and stand for thirty minutes.  She opined he needed to change positions every thirty minutes.  She opined that Keefer could sit for a total of four hours and stand/walk for a total of two hours in an eight-hour workday.  Dr. Albers said Keefer could not perform repetitive actions with his hands, but had good use of both hands and fingers for bilateral manual dexterity and could manipulate small objects with his hands. R. 436-38.

Dr. Albers opined that due to Keefer's anxiety he was: mildly to moderately limited in remembering locations and work-like procedures; mildly limited in understanding, remembering, and carrying out simple repetitive tasks; mildly to moderately limited in remembering and carrying out detailed instructions; moderately limited in concentrating for extended periods of time; mildly limited in working with others; moderately limited in making simple work-related decisions and completing a normal workday and work at a consistent pace; moderately limited in interacting with others; moderately limited in asking questions, requesting assistance, accepting instructions, and responding appropriately to criticism; mildly limited in getting along with coworkers; moderately to markedly limited in traveling to

unfamiliar places; and moderately limited in setting realistic goals.   R. 440-41.

Dr. Albers opined that Keefer's limitations would be exacerbated by any type of work-related stress.  Dr. Albers opined that a routine, repetitive, simple entry-level job would exacerbate Keefer's psychological symptoms. R. 441.  Dr. Albers opined that Keefer's psychological impairments would cause him to be unable to complete a workday more than three or four times a month.  R. 442.  Dr. Albers concluded with a handwritten note,

> Severe Anxiety
> Some good days but not sustained
> This is with treated anxiety

R. 442.

On February 13, 2013, Keefer completed another Function Report—Adult form.  R. 261-68.  Michelle Keefer wrote down Keefer's responses for him.  R. 268.  Keefer said that his anxiety "makes it hard for me to interact with others."  He said his impaired right hand limited his ability to complete work.  He said his back pain limited his ability to lift or maneuver heavy items.  R. 261.  Keefer said that he helped with his children, "but I am limited to the amount I can help."  Keefer said he had trouble sleeping if his anxiety was high.  He also said his back pain made it hard to sleep. R. 262.

Keefer said he prepared simple meals for himself. He said he did simple household chores, but the chores take twice as long to complete. He said he did not do any yard work. Keefer said he did not participate in family activities. He said his anxiety kept him from social settings with his family and children. He participated in small family social events "every couple of months." R. 265.

Keefer said he could lift ten pounds, walk for one to two blocks, sit for an hour, and stand for approximately thirty minutes. Keefer said he could pay attention for one to two hours. He said that he finished what he started. He could follow instructions. He got along with authority figures, but his anxiety sometimes interfered with his ability to communicate. Keefer said whether he could handle stress depended on his anxiety level. He said he did not handle change very well. R. 266-67.

On February 13, 2013, Keefer also completed a Physical Impairment Questionnaire. R. 270-71. Keefer said he could use kitchen tools except that a "manual can opener can be difficult." He said opening jars could be difficult. He said turning pages, sorting, and filing was painful if done for extended periods. He said he could carry light grocery bags. He said he could reach above his head, but could not lift heavy objects above his head. R. 270. He said he got in and out of a car and in and out of a chair

without assistance, but the maneuvers hurt his back.  He could sit for an hour before he had to move around.  He had to rest for ten to fifteen minutes after standing or walking for long periods.  R. 271.

On March 6, 2013, Dr. Sandra Bilinsky, M.D., prepared a Physical Residual Capacity Assessment.  R. 107-09.  Dr. Bilinsky opined that Keefer could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk six hours in an eight-hour workday; and sit six hours in an eight-hour workday.  Dr. Bilinsky opined that Keefer could frequently climb ramps and stairs, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds; and occasionally stoop.  Dr. Bilinsky opined that Keefer should avoid concentrated exposure to extreme heat, extreme cold, fumes, odors, dusts, gases, and poor ventilation.  R. 107-08.

On October 8, 2013, Keefer saw Dr. Albers for a follow up on ankle and knee injuries.  Keefer reported that he rolled his ankle two months earlier.  He reported pain and swelling in the foot.  Dr. Albers ordered an x-ray of the right foot.  Dr. Albers also noted that Keefer tried Effexor for his anxiety, but could not tolerate it.  Keefer remained on the Alprazolam three times a day as needed.  Dr. Albers noted that Keefer's anxiety was stable with the medication.  Albers also noted that Keefer was alert and

cooperative, with a normal mood and affect, good eye contact, and normal attention span and concentration R. 488-89, 491.

On January 14, 2014, Keefer saw Dr. Albers for an annual physical. Dr. Albers noted that Keefer's anxiety was controlled. Dr. Albers noted that Keefer's back pain was controlled. On examination, Albers was alert and cooperative, with a normal mood and affect, good eye contact, and normal attention span and concentration. Keefer's gait and stance were normal. Dr. Albers noted a lumbar muscle spasm. Dr. Albers continued the prescription of Alprazolam. R. 505, 508.

## THE ADMINISTRATIVE HEARING

On May 7, 2014, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. Keefer appeared with his attorney. Vocational expert Bob Hammond also appeared. R. 40. Keefer's wife Michelle Keefer was also present at the hearing. R. 42. After admitting the exhibits, the ALJ stated, "Okay. And at this time we'll just go ahead and take testimony from the claimant and then if he feels like that he may need or feels that he wants to have the claimant's wife testify, we'll just go ahead then." R. 42.

Keefer testified. Keefer said he was born on January 7, 1971. He was 6 feet 1 inch tall and weighed 275 pounds. He lived in split-level home with his wife and two minor children. R. 42-43. Keefer testified that he had

trouble going up and down the stairs at home.  Keefer said he tried to schedule his day to minimize using the stairs.  Keefer said he took the stairs one step at a time, "I usually put my bad leg before me first and hold onto the railing and then bring up my other leg behind."  R. 67.

Keefer quit high school in the ninth grade, but later graduated high school from an online high school diploma program.  R. 42-43, 46.

Keefer said that he could not drive long distances because he got a burning sensation in his lower back if he sat too long.  The pain radiated into his legs.  He said he could sit for about an hour "before it's too uncomfortable."  R. 44.

Keefer testified that he became disabled on February 4, 2011.  R. 43.  Keefer said he stopped working on that date because of pain in his lower back that radiated into his legs.  Keefer drove a truck for one day when he stopped working on February 4, 2011.  Keefer previously worked as a parts specialist and trailer technician for U-Haul.  R. 47.  He also worked as a general maintenance worker. R. 48-49.  These jobs involved lifting parts weighing up to 120 pounds.  R. 68.  He also was a field manager for the Naval Academy women's soccer team and football team.  He maintained the natural grass and artificial turf fields.  R. 49.  He managed the turf; he did not supervise anyone. R. 69.

Keefer testified that he could not work because, "I had two unfortunate accidents within a short period of time that rendered me a lot of pain in my lower back and left leg, and the other accident basically made my [right] hand non-functional." R. 49. Keefer said that hydrocodone took the edge off the pain but did not relieve it. R. 50. Keefer said the pain was always there. Keefer said the pain varied from a 6 to an 8 or 9 on a scale of 1 to 10. Keefer had not gone to the emergency room due to pain. R. 51.

Keefer testified that he had right carpal tunnel surgery in 1991 and trigger finger surgery as well. Keefer testified that he still had problems with his right wrist:

> My right hand is very sensitive as far as pushing and pulling things. I have a tendon on the outer side of my wrist that tends to roll off the bone which can be extremely painful and simple things like putting my wrist at a 90 degree angle, typing, or writing, causes me a great bit of discomfort.

R. 54. Keefer testified that Dr. Berry recommended surgery for his right wrist. R. 55. Keefer said Dr. Berry recommended multiple surgeries including carpal tunnel release at the wrist, ulnar nerve release at the elbow, and a third procedure to relieve nerve damage on the left little finger and ring finger. Keefer said the procedures would involve multiple surgeries. R. 69.

Keefer testified that he could not go through with the surgery due to his anxiety. Keefer testified that Dr. Berry told him that a repeat carpal tunnel surgery had a 2 percent chance of success. Keefer initially decided to have the surgery anyway, but changed his mind. Keefer testified that he changed his mind due to his anxiety. R. 54-55.

Keefer testified that he had loss of feeling and weakness in his right hand. Keefer testified that he could grasp objects, but he occasionally dropped them. He said he had weakness in all of his fingers. He said that he sometimes had throbbing pain that radiated to his elbow. R. 56. Keefer said he used his left hand to carry a full gallon of milk. He said he could lift lighter objects with his right hand. Keefer said repetitive motions increased his pain. Keefer said he had problems with buttons. R. 70-71. Keefer said the pain in his hand was an 8 on a scale of 1 to 10. He said the hydrocodone helped with his wrist pain. He also took ibuprofen. R. 56.

Keefer testified that he did not use any techniques or regimens to address his pain beyond using pain medications. He said, "I just try to keep myself comfortable as to not aggravate my injuries anymore." R. 57.

Keefer said he began having anxiety in 1996. He said he was diagnosed with persistent anxiety. Keefer said he later had a bad experience during an MRI. He had a panic attack; he "felt like I was going

to die or have a heart attack." The MRI was stopped. Keefer said "[E]ver since then, yes, I have a fear of a bad outcome of surgery." R. 57.

Keefer said he managed his anxiety and panic attacks by avoiding situations that triggered attacks like crowds and confined spaces. Keefer said he did not have "claustrophobic issues" before the bad MRI. R. 58. Keefer said that he had problems concentrating because of his anxiety. Keefer testified that his mind wandered, and he had difficulty focusing on and grasping a topic. R. 72.

Keefer testified that he had seen psychiatrists off and on since 1996. Keefer could not remember the name of any psychiatrist he saw. Keefer did not see a therapist for his anxiety. R. 59-60.

Keefer said he had no problems associating with family and friends. He did not go to the grocery store and only rarely went out to a restaurant. R. 60. Keefer said that when he went to a public place, "I always have to make sure I'm on the outside seat of any row so I can position myself to get out of there if need be." R. 74.

Keefer said he enjoyed watching movies all the way through. He read sports books related to fishing. He did not fish. He rarely went to a sporting event. He went to a few semi-pro football games with his children.

R. 60.  He said that he and his children sat by themselves on a hill at the end zone to avoid the crowds.  R. 73.

Keefer said he rarely attended his children's events such as concerts or games.  He attended a Chinese New Year celebration where his daughter sang, but left early due to anxiety.  R. 60-61.  He said he left as soon as his daughter finished singing.  He said he could not stand the "ambient noises" in the crowd.  R. 72.

Keefer took Alprazolam for his anxiety.  He said that he took it every day.  R. 62.  He said the medication sometimes made him "too loopy to even drive."  R. 62.  Keefer said he took extra medicine to go to a doctor's appointment or to come to the hearing.  Keefer said he was "overheated, and anxious, and nervous right now."  R. 67.

Keefer said he could not sleep at night.  He testified that he usually slept three to four hours a night.  He said he could not sleep because of the pain, particularly the pain in his wrist, "I have to keep my arm elevated above my head to try to alleviate some of the pain."  R. 62.  Keefer said he dozed off without trying during the day because he was so tired.  R. 73

Keefer said he could bathe and dress himself.  Keefer said he helped pick up things around the house.  He cooked about once a week.  Keefer said he rarely went out.  R. 62. He said he used a home computer to pay

bills and read. He said, "[M]ost of my reading materials is from online." He used EBay and Facebook. R. 63. Keefer said he used an IPad touch screen rather than a keyboard. He said he usually used his left hand to operate the IPad. R. 71-72. Keefer said that he mostly sat in a recliner while the children were out of the house at school. R. 74.

Keefer opined that he could stand for half an hour and sit for an hour. Keefer said that after sitting for an hour, he needed to lie down or sit in a recliner. Keefer said he could walk for twenty minutes. R. 65. Keefer said that he walked at a slow pace. R. 74. Keefer said one doctor mentioned surgery on his back after physical therapy, but no doctor ever scheduled surgery or otherwise mentioned back surgery. R. 66.

At the conclusion of Keefer's testimony, the ALJ asked if Keefer wanted to have Michelle Keefer testify. Keefer and his attorney decided not to have her testify:

> ALJ: Okay. Did you want to go ahead and call the claimant's wife or would you prefer -- are you satisfied?
>
> ATTY: I'm satisfied, your honor, unless if Mr. Keefer wants me to, I'll bring her in, but I'm satisfied with his testimony.
>
> CLMT: That's completely up to you, sir.
>
> ATTY : You know, I think we can dispense with it, your honor, and if there's something that she wants to add later, would it be permissible for me to submit it along with the medical records in the form of a written statement?

ALJ: That is fine.

ATTY: I would note for the record, she did twice, I don't have the exact exhibit number but she submitted third party function reports.

ALJ: All right.

ATTY: So we do have some of her statements already.

ALJ: Okay. Okay. That's fine, yeah, again, the record is going to be held for two weeks so hopefully, you know, she can submit, you know, whatever kind of statement that she'd like and I'll consider it. . . .

R. 75.

Vocational expert Hammond then testified.  The ALJ asked

Hammond:

I'd like you to consider a hypothetical claimant of the same age, education, and having the same past work experience as this claimant limited to a  range of light work, occasional climbing ramps and stairs, no climbing ladders, ropes, or scaffolds, occasional stooping, kneeling, crouching, crawling, and balancing.
. . . .
Occasional ramps and stairs, no ladders, ropes, or scaffolds, occasional stooping, kneeling, crouching, crawling, and balancing. Avoid concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation. Limited to simple, routine, repetitive tasks with performance measured on a daily not hourly basis. Is there any past work he can perform with that hypothetical?

R. 78.  Hammond opined that the person could not perform Keefer's past

work.  Hammond opined that such a person could perform the jobs of mail

clerk, with 1,500 such jobs in Illinois and 118,000 nationally; usher ticket taker, with 900 such jobs in Illinois, and 50,000 nationally; and injection molder.  Hammond did not opine on the number of injection molder jobs available.

The ALJ asked Hammond to assume the person described in the hypothetical question was restricted to sedentary work limited by the other limitations described in the original question.  Hammond opined that such a person could perform the job of document preparer with 2,300 such jobs in Illinois and 70,000 nationally, and a circuit board screener, with 2,400 such jobs in Illinois and 60,000 nationally.  R. 78-79.

Hammond opined that the person could perform the jobs he identified even if the person was limited to frequent but not constant handling with his right dominant hand.  Hammond opined that if the person was also limited to occasional contact with the public and no contact with three or more persons, he could not do the usher ticket taker job, but could do the other jobs listed.  R. 79-81.

Hammond said that occasional handling with the right hand or being off task 15 percent of the time would eliminate all positions.  Hammond said that limiting use of the right hand to half the workday would eliminate all jobs.  Having to stop every ten minutes to rest five minutes would eliminate

all work.  Hammond said excessive absenteeism would also eliminate all

jobs.  R. 81-85.  The hearing then concluded.  Keefer did not submit an

additional statement by Michelle Keefer after the hearing.

<u>THE DECISION OF THE ALJ</u>

On July 17, 2014, the ALJ issued her decision. R. 23-32.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Keefer met his burden at Steps 1 and 2.  Keefer had not engaged in substantial gainful activity since his February 4, 2011, and he had severe impairments of degenerative disc disease, lipomatosis, carpal tunnel syndrome, ulnar neuropathy, COPD, major depressive disorder, anxiety disorder, history of substance abuse, and obesity.  R. 25.

At Step 3, the ALJ determined that Keefer's impairments or combination of impairments did not meet a Listing.  The ALJ determined

that Keefer's spinal impairments did not meet Listing 1.04 for disorders of the spine. The ALJ stated that Keefer's condition did not meet or equal the requirements of nerve root compression, spinal arachnoiditis, or lumbar spine stenosis. The ALJ determined that Keefer's carpal tunnel and ulnar neuropathy did not meet or equal Listing 1.08 for soft tissue injuries to the extremities. The ALJ stated that Keefer was not under surgical management to salvage or restore major function, had not lost major function of an extremity, and did not have neurological deficits required for the Listing. R. 27-28.

The ALJ also determined that Keefer did not meet the applicable Listings for mental impairments, Listings 12.04, 12.06, and 12.09.[6] The relevant portions of these Listings required that the person have two of the following three limitations: marked restrictions in the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration persistence, or pace; or repeated episodes of decompensation, each of extended duration. See Listing 12.04.B; 12.06.B; and 12.09.B. The ALJ found that Keefer had mild limitations in activities of daily living; mild difficulties in social functioning;

---

[6] The ALJ applied the version of these Listings in effect at the time of the hearing. The Social Security Administration changed these Listings as of January 17, 2017. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 2016 WL 5341732 (September 26, 2016).

moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. The ALJ relied on Keefer's testimony and Function Reports that he performed household chores, engaged in family activities, paid bills, read, and used the computer. The ALJ relied on Dr. Albers' repeated treatment notes that said Keefer had normal mood and affect, normal attention span, and concentration. The ALJ also relied on Dr. Trello's mental status examination in which Dr. Trello said Keefer had intact memory, concentration, abstract judgment, and reasoning. R. 28.

At Step 4, the ALJ found that Keefer had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to occasional climbing ramps and stairs, no climbing ladders, ropes or scaffolds, occasional stooping, kneeling, crouching, crawling, or balancing. He must avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation. He is limited to simple, routine, repetitive tasks with performance measured on a daily and not hourly basis. He is limited to frequent but not constant handling with the right, dominant hand, and only occasional contact with the public.

R. 29. The ALJ relied on the MRI that showed mild degenerative changes in Keefer's spine and Dr. Albers' treatment notes that stated that Keefer's back pain was stable and controlled with medication. The ALJ also relied on the opinions of Drs. Madala and Bilinsky. The ALJ noted that several exams showed positive straight leg testing, some loss of strength in the

lower extremities, and some limited range of motion in the spine. The ALJ found that the limitations showed by all of this evidence was consistent with the RFC of a limited range of light work. R. 29, 31.

The ALJ noted Keefer's carpal tunnel syndrome in his dominant right hand. The ALJ noted that Keefer was scheduled to have surgery, but the surgery has not happened. The ALJ noted that Keefer continued to engage in activities that used his hands. The ALJ found that the RFC accounted for the carpal tunnel syndrome by limiting Keefer to frequent, but not constant handling with his dominant right hand. R. 30.

The ALJ discounted Dr. Albers' January 8, 2013 opinions. The ALJ found that her opinions on Keefer's limitations were not supported by objective medical evidence and were inconsistent with her treatment notes. The ALJ noted Dr. Albers stated in several treatment notes that Keefer's anxiety was controlled or stable, or both. The ALJ also noted Dr. Albers stated that his back pain was also stable and controlled in 2014. R. 27, 30-31.

The ALJ also discounted Dr. Trello's GAF score of 50 and her conclusions. He said that they were inconsistent with her mental status exam in which she found that Keefer had intact memory, concentration,

abstract reasoning, judgment, had a good fund of information, and had no difficulty with simple calculations.  R. 26.

The ALJ discounted Keefer's testimony about his limitations.  The ALJ found the testimony was not consistent with the objective medical evidence and was not consistent with his level of daily activity.  R. 30.

The ALJ found at Step 4 that Keefer could not return to his prior relevant work given his RFC.  R. 31.

The ALJ found at Step 5 that Keefer could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical—Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Hammond.  The ALJ relied on Hammond's opinion that a person with Keefer's age, education, work experience, and RFC could perform the jobs of mail clerk, document preparer, and circuit board screener.  The ALJ found that Keefer was not disabled.

Keefer appealed.  On January 29, 2016, the Appeals Council denied his request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Keefer then filed pro se this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. <u>See</u> <u>Pepper v. Colvin</u>, 712 F.3d 351, 367 (7th Cir. 2014); <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence. The RFC determination was supported by: the opinions of Drs. Madala and Bilinsky; Dr. Albers' treatment notes that indicated that Keefer's pain and anxiety were stable and controlled with medicine; and Dr. Chapa's finding that Keefer had intact fine motor skills with his hands. The decision was also supported by the MRI that showed mild degenerative changes in Keefer's back. The ALJ's decision was additionally supported by Michelle Keefer's Function Report in which she said that he had to avoid repetitive motions, he understood and followed instructions, got along with authority figures, finished what he started, and did not have unusual behaviors or fears. Keefer's first Adult Function Report also supported the ALJ's decision. Keefer said he could understand and follow instructions, get along with authority figures, and handle stress and changes in routine.

Keefer argues in his Motion that he did not know his wife could testify at the hearing (d/e 13, p. 1). This is incorrect. The ALJ asked Keefer and his attorney whether Keefer wanted his wife to testify. Keefer said he would follow his attorney's advice and not have her testify. R. 75. Keefer knew she could testify.

Keefer argues that the ALJ largely ignored the examinations by Drs. Trello and Chapa. The Court disagrees. The ALJ discussed both reports.

The ALJ found that Dr. Chapa's findings were consistent with the RFC determination.  As previously noted, the ALJ discounted Dr. Trello's GAF score of 50 and her conclusions because they were inconsistent with her mental status examination.  The ALJ found that Dr. Trello's mental status examination was consistent with the RFC finding.  The ALJ considered both of these pieces of evidence.

Keefer argues that the ALJ erroneously dismissed Dr. Albers' January 8, 2013 opinions.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[7]  The ALJ found that Dr. Albers' opinions were inconsistent with other evidence in the record, including Dr. Albers' own treatment notes.  Dr. Albers' notes stated repeatedly that Keefer's pain and anxiety were stable, controlled, or both.  That evidence is inconsistent with Dr. Albers' opinions. The ALJ's decision to discount her opinions, therefore, was supported by substantial evidence.

---

[7] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

Keefer argues that the ALJ's decision is inconsistent with vocational expert Hammond's opinions that a person with Keefer's RFC, age, education, and work experience could not work if the person needed additional breaks or frequent absences from work. Those limitations were not included in the ALJ's RFC determination. ALJ did not need to consider a vocational expert's opinions that addressed additional limitations that the ALJ found were not supported by the evidence. See Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009). The ALJ did not err in her treatment of Hammond's opinions.

Lastly, Keefer submitted additional evidence on appeal, including medical treatment notes from March 2016. See Keefer Motion, attached Treatment Notes from March 22, 2016. Such new evidence may support a remand under sentence six of 42 U.S.C. § 405(g) only if the evidence is material and good cause exists for the failure to incorporate the evidence into the record in a prior proceeding. 42 U.S.C. §405(g); Schmidt v. Barnhart, 395 F.3d 737, 742 (7th Cir. 2005). The new treatment notes are from an examination that occurred more than a year and a half after the ALJ's decision. Such post hearing medical evidence does not speak to Keefer's condition at the time of the administrative hearing. As such, the

evidence is not material.  Schmidt, 395 F.3d at 742.  The new evidence does not provide a basis for a remand.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Michael Brandon Keefer's Motion for Summary Judgment (d/e 13) be DENIED; Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 16) be ALLOWED; and the decision of the Commissioner be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:  August 24, 2017

_s/ Tom Schanzle-Haskins_
UNITED STATES MAGISTRATE JUDGE